EBEL, Circuit Judge.
This case involves a prosecution under 8 U.S.C. § 1326, which makes it a crime to be present in the United States illegally after having been previously deported. Here, two border patrol agents, acting on an anonymous tip, stopped Gustavo Olivares — Rangel (“Defendant”) as he was leaving a trailer park and questioned him about his identity and citizenship. After Defendant admitted to being an illegal alien, he was arrested and taken to a border patrol station where he was questioned further and fingerprinted. Based on his fingerprints, the agents were able to connect Defendant to an INS file that indicated he had a previous felony conviction. This increased the maximum penalty for Defendant’s § 1326 offense to a sentence of 20 years.
Defendant argued that his seizure was not based upon probable cause or reasonable suspicion and moved to suppress all the evidence in the case as fruit of the poisonous tree. The district court agreed and excluded Defendant’s statements, his fingerprints, and the contents of his INS file. On appeal, the Government does not contest the illegality of the seizure. Rather, it argues primarily that the Supreme Court’s decision in Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), forecloses the possibility of suppressing any evidence of identity in a criminal case.
*1106 We conclude that Lopez-Mendoza does not prevent the suppression of all identity-related evidence. Rather, Lopez-Mendoza merely reiterates the long-standing rule that a defendant may not challenge a court’s jurisdiction over him or her based on an illegal arrest. Ultimately, we conclude that evidence of Defendant’s oral statements were correctly suppressed. However, we remand for further factfinding on the suppression of Defendant’s fingerprints and his INS file.
Having jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we AFFIRM in part, REVERSE in part, and REMAND.
BACKGROUND
I. Factual background
Sometime during January 2004, agents Luis Armendariz and Mark Marshall of the United States Border Patrol apprehended an illegal alien (“the informant”) in Berino, New Mexico. On the way to the border patrol station, the informant told one of the agents that he knew of several other illegal aliens living in a trailer in Vado, New Mexico, who were possibly burglarizing homes in the area. The agents took a detour to a trailer park in Vado, and the informant pointed out the trailer where the alleged criminals lived.
Over the next three weeks, Agents Armendariz and Marshall made numerous visits to the trailer park in Vado looking for the suspects, but did not discover anyone until February 2, 2004. At about 10:00 a.m. on that date, the agents approached the trailer and saw a green pickup truck exiting the narrow driveway. The agents intercepted the vehicle, thereby blocking its exit from the trailer park. Once the vehicles were bumper-to-bumper, Agent Armendariz immediately recognized the passenger of the pickup as Defendant, an immigrant he had arrested a month or two before for being in the United States illegally.[1]
Agent Armendariz questioned the occupants of the pickup (including Defendant) about their citizenship prior to giving any warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to Agent Armendariz, Defendant admitted he was a Mexican citizen and in the United States illegally. Defendant was then arrested and taken to the border patrol station where he was fingerprinted and asked about his biographical information. Based on this evidence, Agent Armendariz connected Defendant with his immigration record and prior criminal record (also known as his “A-file” or “alien file”), which indicated that he was a previously deported alien. At this point, Agent Armendariz first read Defendant his Miranda rights and sent him to the Otero County Jail.
II. Procedural background
On March 4, 2004, a federal grand jury issued an indictment charging Defendant *1107 with illegally being present within the United States after being previously deported, pursuant to 8 U.S.C. § 1326(a) (2000). Because Defendant had been, previously convicted of an aggravated felony, he was also charged under 8 U.S.C. § 1326(b), which made him eligible for a maximum sentence of 20 years’ imprisonment.
Defendant filed a motion to suppress “any physical evidence and statements obtained as a result of the unlawful seizure and interrogation of [Defendant] on February 2, 2004.” Defendant argued that the seizure and interrogation were conducted in violation of his Fourth and Fifth Amendment rights. On June 8, 2004, the district court held a suppression hearing, during which it took testimony from Agents Armendariz and Marshall as well as Sofia Delgado, a witness to the events of February 2, 2004.
The district court granted Defendant’s motion, suppressing “all statements and fingerprints seized from [Defendant], as well as the immigration and criminal records located using that evidence of identity.” In its written order, the court made a number of conclusions of law which are relevant to this appeal.
First, the court concluded that both “the stop and subsequent arrest” of Defendant at the trailer park violated the Fourth Amendment. The Government did not directly dispute this conclusion, nor did it argue in either its opening or reply brief that Border Patrol had probable cause to arrest Defendant. To the contrary, the Government expressly acknowledged in its briefing that it was “not challenging] the district court’s factual findings and conclusions that Border Patrol violated [Defendant’s Fourth Amendment right[s].” Additionally,, at oral argument, the Government explicitly confirmed that it was appealing only the legal question of whether Defendant’s identity-related evidence could be suppressed as fruits of a poisonous tree and was not appealing the district court’s conclusion that Border Patrol lacked probable cause to arrest Defendant.[2] Accordingly, the Government waived the issue of probable cause by failing to raise it, see State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n. 7 (10th Cir.1994), and conceded for purposes of this appeal that Defendant was unlawfully arrested.[3]
Second, the court determined that the fingerprints taken at the border patrol station and the statements that Defendant made at that time must be suppressed as “fruit of the poisonous tree.” In doing so, the court applied the factors set forth in Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Specifi *1108 cally, with regard to Defendant’s oral statements, the court noted that Miranda warnings had not been given when Defendant incriminated himself.[4]
Third, the court concluded that the Government had not met its burden of proving that the evidence in question would have been inevitably discovered in the absence of the Fourth Amendment violation. See United States v. White, 826 F.3d 1135, 1138 (10th Cir.2003). The Government has not appealed this point.
Fourth, the court considered and rejected the very argument that the Government makes on appeal here, that the “body” or “identity” of a defendant is never itself suppressible as fruit of an unlawful arrest and thus no evidence pertaining to identity may be suppressible. See Lopez-Mendoza, 468 U.S. at 1039, 104 S.Ct. 3479. Concluding that the Supreme Court was speaking about jurisdictional challenges under the Fourth Amendment as opposed to evidentiary challenges to tainted identity evidence, the district court held Lopez-Mendoza was inapplicable and that the case did not prohibit suppression of the statements and fingerprints.
Finally, the court turned to the contents of Defendant’s A-file. Since it had concluded that all of the evidence leading Agent Armendariz to discover the existence of the file should be suppressed, the court also suppressed the contents of the A-file, which included Defendant’s criminal and immigration records.
To summarize, the district court excluded four pieces of evidence: (1) Defendant’s initial statement at the time of his arrest; (2) the fingerprint evidence taken at the border patrol station; (3) the contents of Defendant’s A-file; and (4) Defendant’s oral statements regarding biographical information made at the border patrol station. The instant appeal by the government followed.
DISCUSSION
I. Standard of review
A district court’s decision to suppress evidence under the Fourth Amendment is a question of law that we review de novo. United States v. Evans, 937 F.2d 1534, 1536-37 (10th Cir.1991).
II. Issue on appeal
This appeal raises the question of whether evidence of a defendant’s identity (including statements, fingerprints, and an A-file) may ever be suppressed as the “fruit” of an unlawful arrest. Before examining the merits of the Government’s argument, it is helpful first to place this issue in its proper Fourth Amendment context.
The ordinary remedy in a criminal case for violation of the Fourth Amendment is suppression of any evidence obtained during the illegal police conduct. See Mapp v. Ohio, 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In addition, a defendant may also suppress any other evidence deemed to be “fruit of the poisonous tree,” (ie., evidence discovered as a direct result *1109 of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence. Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Navar-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000).
Once the defendant meets this burden, the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree. Navar-Ramirez, 210 F.3d at 1131. According to the Supreme Court, the overriding issue in “fruits” cases is
whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.
Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (quotations and citation omitted). The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct. Id.
Although the Government argued inevitable discovery and attenuation of the taint below, its does not reassert these doctrines on appeal. Instead, its primary position on appeal is that the evidence of identity of a defendant is never suppressible as the fruit of an unlawful arrest. Accordingly, we address that issue first.
III. Suppressability of identity-related evidence as fruit
In arguing that identity evidence should never be suppressible as fruit of the poisonous tree, the Government relies almost exclusively on a single sentence in Lopez-Mendoza :
The “body” or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.
468 U.S. at 1039, 104 S.Ct. 3479.[5] Here, of course, the district cohrt suppressed statements and fingerprints along with files located using such “evidence of identity.” At first blush, the above-quoted language in Lopez-Mendoza appears to control the case at bar; however, a closer analysis indicates that the issue is more complex than the Government presents it to be.
A. Lopez-Mendoza and related lower-court cases
In Lopez-Mendoza, the Court reviewed two civil deportation proceedings that took place following unlawful arrests. 468 U.S. at 1034-35, 104 S.Ct. 3479. In the first case, respondent Adan Lopez-Mendoza (“Lopez”) argued that the immigration court did not have personal jurisdiction over him by virtue of the fact that his arrest had been unlawful; he did not object to the specific evidence offered against him: namely, his oral and written admissions to law enforcement officers concerning his identity and citizenship. Id. at 1035, 104 S.Ct. ■ 3479. The immigration court held that the .legality of Lopez’s arrest was irrelevant to its jurisdiction and overruled the objection. Id.
In the second case, respondent Elias Sandoval-Sanchez (“Sandoval”) argued that incriminating statements regarding his nationality and identity were fruit of an illegal arrest and should be suppressed. Id. at 1037, 104 S.Ct. 3479. Ultimately, *1110 the lower courts held that Sandoval’s detention violated the Fourth Amendment and held that the statements could not be used against him in his civil deportation proceedings. Id.
Thus, by the time the cases came to the Supreme Court, two questions readily presented themselves for review: (1) whether an illegal arrest deprived the immigration court of jurisdiction over the respondent’s “person”; and (2) whether the exclusionary rule, which is typically a remedy in criminal cases, would be extended to apply to civil deportation proceedings.
Dealing with the Lopez claim first, the Court held that the immigration court retained jurisdiction because “[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding.” Id. at 1040, 104 S.Ct. 3479 (quotation omitted). It was in this context in which the Court noted that the “body” or identity of a defendant is never suppressible as fruit of an unlawful arrest. Id. at 1039-40, 104 S.Ct. 3479 (citing, inter alia, Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) and Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952)). Based on the cases the Court cited, it appears that the majority was referencing the long-standing rule, known as the Ker-Frisbie doctrine, that illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution. See Ker v. Illinois, 119 U.S. 436, 443, 7 S.Ct. 225, 30 L.Ed. 421 (1886) (holding that the constitution does not prevent criminal jurisdiction over a defendant who was forcibly abducted from another country); Frisbie, 342 U.S. at 522, 72 S.Ct. 509 (“This Court has never departed from the rule announced in [Ker] that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court’s jurisdiction by reason of a ‘forcible abduction.’ ”); see also Gerstein, 420 U.S. at 119, 95 S.Ct. 854 (reiterating the Court’s “established rule” that illegal arrest or detention does not void a subsequent conviction).
The Lopez-Mendoza Court then turned its attention to Sandoval’s claim, which was not directed to the jurisdiction of the immigration court, but rather to the admissibility of statements regarding Sandoval’s citizenship and identity that were made following the illegal arrest. 468 U.S. at 1040, 104 S.Ct. 3479. The Court first undertook to decide if the exclusionary rule itself extended to non-criminal, civil deportation proceedings. Id. at 1041, 104 S.Ct. 3479. After applying the factors in United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Court held that the exclusionary deterrent should not apply to civil deportation proceedings. Lopez-Mendoza, 468 U.S. at 1050, 104 S.Ct. 3479.
The language in Lopez-Mendoza concerning the suppressability of a defendant’s “body” or “identity” has been the cause of much consideration by the lower courts. The Ninth Circuit has relied upon this language to justify denying suppression of either a defendant’s identity or his governmental files in prosecutions brought under 8 U.S.C. § 1326. See United States v. Guzman-Bruno, 27 F.3d 420, 422 (9th Cir.1994). The Eighth Circuit, on the other hand, upheld the suppression of physical fingerprint evidence obtained after an illegal arrest, but not in the context of a routine booking, and further concluded that the “identity” language in Lopez-Mendoza referred only to jurisdictional challenges and did not foreclose suppression of all identity-related evidence. United States v. Guevara-Martinez, 262 F.3d 751, 754 (8th Cir.2001). We find the Eighth Circuit’s analysis persuasive.
*1111 B. Analysis
We do not read Lopez-Mendoza as exempting from the “fruits” doctrine all evidence that tends to show a defendant’s identity. Rather, the Supreme Court’s statement that the “body” or identity of a defendant are “never suppressible” applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence.' This much is evident simply from looking at the cases the Court cites in support of its proposition. See Frisbie, 342 U.S. at 522, 72 S.Ct. 509; Gerstein, 420 U.S. at 119, 95 S.Ct. 854. As the Eighth Circuit noted in Guevarar-Martinez:
These cases [relied upon by the Court in Lopez-Mendoza ] deal with jurisdiction over the person, not evidence of the defendant’s identity illegally obtained. The language in Lopez-Mendoza should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.
262 F.3d at 754.
The limited scope of Lopez-Mendoza is also clear from analyzing the two separate proceedings in that case. Lopez argued only that the immigration court lacked personal jurisdiction over him due to the illegal arrest. 468 U.S. at 1035-36, 104 S.Ct. 3479. He did not challenge the admissibility of his statements to officers disclosing his identity. See id. Sandoval, on the other hand, specifically raised an evidentiary challenge to identity-related statements he sought suppressed. Id. at 1037, 104 S.Ct. 3479. If the “identity” language (which is first mentioned in connection with Lopez’s jurisdictional challenge) applied with equal force to Sandoval’s evidentiary challenge, there would have been no need for the Court to dispose of Sandoval’s case separately. See id. at 1040-41, 104 S.Ct. 3479 (referring to the “general [exclusionary] rule [to be applied] in a criminal proceeding” in discussing Sandoval’s evidentiary challenge, without distinguishing between identity-related evidence and other types of evidence).
Seeking to suppress one’s very identity and body' from a criminal proceeding merely because of an unconstitutional arrest is the sort of jurisdictional challenge foreclosed by Lopez-Mendoza. The language in Lopez-Mendoza merely says that the defendant cannot suppress the entire issue of his identity. A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in Mapp and Wong Sun. A broader reading of Lopez-Mendoza would give the police carte blanche powers to engage in any manner of unconstitutional conduct so long as their purpose was limited to establishing a defendant’s identity. We do not believe the Supreme Court intended Lopez-Mendoza to be given such a reading.
Furthermore, specifically with regard to fingerprint evidence, the Supreme Court has made it clear on two occasions that fingerprint evidence (which is undeniably identity evidence) obtained after an illegal arrest may be suppressed under the exclusionary rule if obtaining the fingerprints was the objective of the illegal arrest. Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Hayes v. Florida, 470 U.S. 811, 815, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). Because Lopez-Mendoza did not expressly overrule Hayes and Davis, we are bound to apply those earlier cases. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (warning that the circuit courts should not conclude that more *1112 recent Supreme Court cases have, by implication, overruled earlier precedents).
Our conclusion from Lopez-Mendoza, Davis, and Hayes, considered together, is that the “identity” language in Lopez-Mendoza refers only to jurisdiction over a defendant and it does not apply to evidentiary issues pertaining to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a criminal proceeding. Instead, we utilize the normal and generally applicable Fourth Amendment exclusionary rule to determine whether challenged identity-related evidence should be excluded under the circumstances present in the particular case.
IV. Suppression of Defendant’s statement, fingerprints, and A-file
Having concluded that Lopez-Mendoza refers only to jurisdictional challenges, and not to challenges to the admissibility of identity-related evidence, we must now determine whether the general exclusionary rule requires suppression of Defendant’s statements, his fingerprints, and his A-file under the circumstances present here, see Guevara-Martinez, 262 F.3d at 754-55; however, we must do so only if the Government preserved for appeal its argument against suppression under the general exclusionary rule.
A. Defendant’s statements
According to the record, Defendant made statements concerning his identity and nationality directly after his illegal arrest and again at the border patrol station. The district court concluded, after applying the factors in Brown, 422 U.S. at 603-04, 95 S.Ct. 2254, that the taint from Defendant’s illegal arrest had not become sufficiently attenuated so as to permit admission of Defendant’s incriminating statements. On appeal, the Government does not re-assert its attenuation-of-the-taint argument with regard to these statements. The Government’s opening brief does not even mention the Brawn factors or contend that the district court misapplied them. Rather, the Government rests its challenge to the suppression of Defendant’s statements solely on the broader proposition that Lopez-Mendoza prevents a defendant from ever seeking suppression of evidence of his identity. That proposition having been rejected for the reasons stated above, we decline to disturb the conclusion of the district court that the taint from the illegal arrest was not sufficiently attenuated by the time Defendant spoke to law enforcement officers so as to permit admission of the statements concerning identity and nationality.
B. Fingerprints
On the issue of the exclusion of fingerprints, the Government does expand its argument beyond its interpretation of Lopez-Mendoza. It also argues that if Lopez-Mendoza does not place identity evidence off limits from suppression, then under the ordinary application of the exclusionary rule Defendant’s fingerprints should not be suppressed because this case is distinguishable from Davis and Hayes. We therefore review whether Defendant’s fingerprints constitute fruit of the poisonous tree that must be excluded under the facts of this case.
Based on Defendant’s now-suppressed statement of identity, Agent Armendariz took Defendant to the border patrol station where he was fingerprinted. Thus, there is a factual nexus between the illegal conduct and the evidence in question (fingerprints). Nevertheless, we distinguish between fingerprints that are obtained as a result of an unconstitutional governmental investigation and fingerprint evidence that is instead obtained merely as part of a routine booking procedure. In doing so, we hold that fingerprints administratively taken in conjunction with an arrest for the *1113 purpose of simply ascertaining or confirming the identity of the person arrested and routinely determining the criminal history and outstanding warrants of the person arrested are sufficiently unrelated to the unlawful arrest that they are not suppressible. Ultimately, however, we reverse and remand on this issue because the factual record in this case is insufficient to determine whether Defendant’s unconstitutional arrest was purposefully exploited in order to develop critical evidence of criminal conduct to be used against Defendant.
1. Routine booking procedures and the exclusionary rule
Certain routine administrative procedures, such as fingerprinting, photographing, and getting a proper name and address from the defendant, are incidental events accompanying an arrest that are necessary for orderly law enforcement and protection of individual rights. See 6 Wayne R. LaFave, Search and Seizure § 11.4(g), at 362 (4th ed. 2004) (“[Fingerprinting, like photographing, is' a rather standard booking procedure.”). Fingerprinting ensures that the person who has been arrested is in fact the person law enforcement agents believe they have in custody. See Notes and Comments, Excluding From Evidence Fingerprints Taken After an Unlawful Arrest, 69 Yale L.J. 432, 438 n. 30 (1959-60) (“In addition to establishing identity at the time of arrest, fingerprints are useful in aiding the apprehension of escaped prisoners, and in ascertaining whether the defendant has been previously convicted ....”) (citing United States v. Kelly, 55 F.2d 67, 70 (2d Cir.1932)); 3 LaFave, supra, § 5.3(c), at 168 (“Fingerprinting, as a routine part of the booking process, is justified by the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in ensuring his identification in the event he flees prosecution .... ”). It is therefore considered “elementary that a person in lawful custody may be required to submit to ... fingerprinting as part of routine identification processes.” Smith v. United States, 324 F.2d 879, 882 (D.C.Cir.1963) (citations omitted). The government always has the right, and indeed the obligation, to know who it is that they hold in custody regardless of whether the arrest is later determined to be illegal.
In light of the underlying purpose of the exclusionary rule, it would make little sense to suppress fingerprint evidence obtained merely as part of a routine booking procedure, even where a judge subsequently rules that the arrest was illegal. The exclusionary rule “is calculated to prevent, not to repair. Its purpose is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.” Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); see also Excluding From Evidence, supra, 69 Yale L.J. at 436 n. 24 (“[T]he threat of exclusion will operate as intended only if an excludable piece of evidence is the target of the police activity, and if the police are previously aware of the rule and its threat to the success of their venture.”).
A blanket rule excluding fingerprint evidence obtained after an illegal arrest would have neither a practical deterrence effect on unlawful arrests that were not made for the purpose of obtaining fingerprint evidence nor would it outweigh the substantial social costs of suppressing such evidence. See Penn. Bd. of Probation and Parole v. Scott, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (directing that the exclusionary rule applies “only where its deterrence benefits outweigh its substantial social costs”) (quotation omitted). Accordingly, although Lopez-Men *1114 doza does not automatically exempt all fingerprint evidence from application of the Wong Sun doctrine, application of that rule indicates that fingerprints taken as part of a routine booking procedure following an arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and should not be suppressed.[6] See United States v. Garcia-Beltran, 389 F.3d 864, 868-69 (9th Cir.2004) (holding that fingerprint evidence obtained as a result of an alien’s illegal arrest need not be suppressed if the fingerprints were taken merely for purposes of identification such as during a routine booking procedure); Guevara-Martinez, 262 F.3d at 756 (suppressing fingerprint evidence where the government offered “no evidence that the fingerprints were obtained as a matter of course through routine booking procedures”); see also Paulson v. State, 257 So.2d 303, 305 (Fla.Dist.Ct.App.1972) (holding that fingerprints routinely taken after illegal arrest could be used in a subsequent prosecution for another crime).
This is not to say that fingerprint evidence taken after an illegal arrest, even as part of a routine booking procedure, is never suppressible. By focusing upon the purpose for an illegal arrest and subsequent fingerprinting in determining whether fingerprint evidence is tainted fruit, courts properly focus on effectuating the underlying policy of the exclusionary rule. This is how we read the Supreme Court’s decisions in Davis and Hayes.
In Davis and Hayes, the Supreme Court held that when an illegal arrest was used as an investigatory devise to obtain fingerprints, the fingerprints were regarded as inadmissible fruit of an illegal detention. Hayes, 470 U.S. at 817-18, 105 S.Ct. 1643; Davis, 394 U.S. at 727-28, 89 S.Ct. 1394. However, both cases arose from illegal arrests made for the purpose of obtaining fingerprints.[7] In suppressing the fingerprint evidence, “the Court focused its attention squarely on the motive of the arresting officers to obtain fingerprints, and made it plain ... that that motive rationalized its decision.” United States v. Ortiz-Gonzalbo, 946 F.Supp. 287, 289 (S.D.N.Y.1996), aff'd on other grounds, No. 97-1210, 1997 WL 829306 (2d Cir. Dec.9, 1997) (unpublished). Specifically, in Davis, the ma *1115 jority held that “[detentions for the sole purpose of obtaining fingerprints are ... subject to the constraints of the Fourth Amendment.” 394 U.S. at 727, 89 S.Ct. 1394 (emphasis added). Additionally, Justice Harlan in his concurring Davis opinion directed that the rule applied by the Davis majority must be limited to situations like the “ ‘dragnet’ procedures employed in th[at] case.” 394 U.S. at 728, 89 S.Ct. 1394 (Harlan, J., concurring). And Justice Brennan, the author of Davis, later stated in his concurring opinion in Hayes that Hayes and Davis were indistinguishable in that “a suspect may not be apprehended, detained and forced to accompany the police to another location to be fingerprinted without a warrant or probable cause.” 470 U.S. at 818-19, 105 S.Ct. 1643 (Brennan, J., concurring in the judgment).
We therefore do not interpret Davis or Hayes as directing that fingerprint evidence obtained as a result of any illegal arrest or detention is always fruit of a poisoned tree. Like a majority of other courts to interpret these cases, we read Davis and Hayes as requiring the suppression of fingerprint evidence only when the illegal arrest was for the purpose of obtaining fingerprints without a warrant or probable cause. See Garcia-Beltran, 389 F.3d at 867; Guevara-Martinez, 262 F.3d at 755; United States v. Jennings, 468 F.2d 111, 115 (9th Cir.1972); see also Ortiz-Gonzalbo, 946 F.Supp. at 288-89; S.E.G. v. State, 645 So.2d 347, 348-49 (Ala. Crim.App.1994); Black v. State, 383 So.2d 295, 297 (Fla.Dist.Ct.App.1980); Paulson, 257 So.2d at 304; Orum v. State, 46 Ala.App. 543, 245 So.2d 829, 830 (Ala.Crim.App.1970).[8] But see United States v. Lyles, 471 F.2d 1167, 1169 (5th Cir.1972) (“If [an arrest is illegal], then the fingerprints taken from appellant pursuant to that arrest will be inadmissible____”); People v. Hernandez, 11 Cal.App.3d 481, 492-94, 89 Cal.Rptr. 766 (Cal.Ct.App.1970) (“Although the Davis case involved the indiscriminate roundup of numerous young men for the purpose of interrogation and fingerprinting, the high court gave no indication that its ruling was to be limited to those facts.”). Without a similar motive, neither Davis nor Hayes require suppression of fingerprint evidence obtained at every illegal arrest or detention.
The exclusionary rule applies “whenever evidence has been obtained ‘by exploitation’ of the primary illegality instead of ‘by means sufficiently distinguishable to be purged of the primary taint.’ Evidence can be obtained ‘by exploitation’ of an unlawful detention even when the detention is not for the sole purpose of gathering evidence.” Guevara-Martinez, 262 F.3d at 755 (quoting Wong Sun, 371 U.S. at 488, 83 S.Ct. 407). Accordingly, we hold that if an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed.[9] See United States v. Flores-Sandoval, 422 F.3d 711, *1116 715 (8th Cir.2005) (affirming exclusion of fingerprint evidence where the defendant’s fingerprints were taken “for the purpose of assisting the [United States Immigrations and Customs Enforcement] investigation”) (quotations, alteration omitted); Garcia-Beltran, 389 F.3d at 868-69 (distinguishing between fingerprints taken for investigative purposes and those taken for identification purposes); Guevara-Martinez, 262 F.3d at .-756 (distinguishing between fingerprints taken as part of a routine booking procedure and fingerprints taken for an INS-related purpose). Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree.
2. Purpose for arresting and fingerprinting Defendant
Accordingly, in determining whether the fingerprint evidence in this case should be suppressed, we must determine the original purpose for arresting and later fingerprinting Defendant; that is, was Defendant fingerprinted merely as part of a routine booking or processing procedure or was the illegal arrest in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity. The precise circumstances under which Defendant was arrested and his fingerprints taken are not clear from the record.
The Government asserts on appeal that Defendant’s fingerprints were taken while he was being processed for having illegally reentered the country; however, Agent Armendariz testified, and the district court found, only that “[Defendant’s fingerprints were obtained at the Border Patrol Station and were used to connect [him] to his immigration record and prior criminal record.” Although it is clear how the fingerprints evidence was ultimately used, there is no evidence in the record before us to support the Government’s assertion that the illegal arrest was not in part for the purpose of obtaining Defendant’s fingerprints to link him to criminal activity. Because, on the record before us, we do not know whether the illegal arrest was purposefully exploited for the objective of obtaining Defendant’s fingerprints, we remand for an evidentiary hearing on this issue. See Garcia-Beltran, 389 F.3d at 865 (remanding to the district court for factfinding in a similar case challenging the admissibility of fingerprint evidence where the factual record regarding the fingerprinting of the defendant was incomplete).[10]
*1117 C. A-file
In its order below, the district court found that Defendant’s fingerprints were used to connect him to his immigration record and prior criminal record, otherwise known as his A-file. The Government argues, in addition to its Lopez-Mendoza argument, that (1) Defendant lacked standing to challenge the introduction of the A-file; and (2) it is inappropriate to suppress this file because its contents were not developed as the result of any illegal activity, but rather the file was compiled prior to, and independently of, the illegal seizure of Defendant. The Government’s challenge thus requires us to determine whether independent government records must be suppressed as fruits of the poisonous tree if the illegal arrest brings to the attention of authorities the fact that an individual is present in the United States and a subsequent check of independently created and maintained records reveals the individual’s immigration and/or prior criminal record.
1. Standing to challenge fruits of the poisonous tree
While the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment violation which constitutes the poisonous tree, see United States v. Salvucci, 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the law imposes no separate standing requirement regarding the evidence which constitutes the fruit of that poisonous tree. In Wong Sun, the seminal case defining the fruit of the poisonous tree doctrine, the defendant, James Wah Toy, moved to suppress, inter alia, drugs found at the house of his co-defendant, Johnny Yee. 371 U.S. at 487-88, 83 S.Ct. 407. Toy had standing to object to admission of the drugs at his trial because of the alleged violation of his Fourth Amendment rights; in that case, the unlawful arrest of Toy. See id. at 484, 83 S.Ct. 407. The Supreme Court suppressed Toy’s statements to the officers, including the statement that he had no drugs but that Yee did, as fruit of the illegal arrest. Id. at 486-87, 83 S.Ct. 407. The Supreme Court ultimately held that Toy was also entitled to suppression of the drugs found at Yee’s house because “it [was] clear that the narcotics were ‘come at by the exploitation of [Toy’s statement]’ and hence that [the drugs] may not be used against Toy.” Id. at 488, 83 S.Ct. 407. Thus, regardless of the fact that Toy maintained no reasonable expectation of privacy in the drugs at Yee’s house, the Supreme Court determined that he could object to them as poisonous fruits. See id. at 488, 83 S.Ct. 407.
In a number of cases, we have reinforced the principle that the relevant inquiry in determining whether a defendant has standing to challenge evidence as fruit of a poisonous tree is whether his or her Fourth Amendment rights were violated, not the defendant’s reasonable expectation of privacy in the evidence alleged to be poisonous fruit. In United States v. DeLuca, 269 F.3d 1128 (10th Cir.2001), for example, the defendant, a passenger in a car, moved to suppress methamphetamine taken from the car. Id. at 1130-31. We held that, although the defendant did not have standing to directly challenge the *1118 search of the car because he had neither a possessory nor property interest in the car, he had standing to challenge the lawfulness of his detention and thus to seek to suppression of the methamphetamine as fruit of that detention. Id. at 1132. See also United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir.1996) (recognizing that, although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in that vehicle as the fruit of the illegal detention); United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir.1995) (same).
Contrary to our conclusion, the Third and Fifth Circuits have expressly concluded that, at least absent egregious circumstances,[11] it is erroneous for a district court to suppress the contents of a defendant’s A-file because an alien charged with illegal reentry has no possessory or proprietary interest in his immigration file or the documentary evidence contained in that file and thus has no standing to challenge the file’s introduction into evidence. See Bowley, 435 F.3d at 431 (citing the expectation of privacy language used in United States v. Pineda-Chinchilla, 712 F.2d 942, 943-44 (5th Cir.1983)); PinedaChinchilla, 712 F.2d at 943-44 (citing Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Contrary to these decisions, we do not read Rawlings or Rakas, nor any other Supreme Court or Tenth Circuit case, to support the proposition that the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the violation which constitutes the poisonous tree and separate standing regarding the evidence which constitutes the fruit of that poisonous tree.[12] Instead, in both Rawlings and Rakas, the Supreme Court merely held that a defendant has standing to seek suppression of evidence only if he “has had his own Fourth Amend *1119 ment rights infringed by the search and seizure which he seeks to challenge.” Rakas, 439 U.S. at 138, 99 S.Ct. 421; Rawlings, 448 U.S. at 104, 100 S.Ct. 2556; see also United States v. Allen, 235 F.3d 482, 489 (10th Cir.2000).
A defendant’s standing to challenge the admissibility of evidence deemed fruit of an illegal search and seizure therefore arises from the alleged violation of his Fourth Amendment rights by virtue of the primary illegality; here, the unlawful arrest of Defendant. There is no independent requirement that a defendant also have standing or a proprietary interest in the items sought to be suppressed under the fruits of the poisonous tree doctrine. See 6 LaFave, supra, § 11.4, at 257 (“[I]t must be cautioned that a defendant ... can prevail on a ‘fruit of the poisonous tree’ claim only if he has standing regarding the violation which constitutes the poisonous tree,” without reference to any other standing requirements) (emphasis added, footnote omitted). In this case, the Government has conceded on appeal that Defendant himself was unlawfully detained and arrested; thus, Defendant has standing to object to any poisonous fruit obtained as a result of that primary illegality.
2. Whether Defendant’s A-File constitutes poisonous fruit
Where, as here, a defendant’s Fourth Amendment rights were violated, the only relevant question in determining whether evidence is fruit of the poisonous tree and therefore subject to the exclusionary rule is “whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” United States v. King, 990 F.2d 1552, 1563 (10th Cir.1993) (quoting Wong Sun, 371 U.S. at 488, 83 S.Ct. 407). In this case, the answer to that question necessarily depends on whether Defendant’s fingerprints, which the Government used to secure Defendant’s A-file, should be suppressed. If the fingerprints are determined to be suppressible it will be because of a determination that the fingerprints were illegally obtained for the investigative purpose of obtaining Defendant’s immigration record and potentially charging him with a more serious crime. Under such circumstances it seems to us thát the A-file is inextricably linked to the fingerprints and if one is a fruit of the poisonous tree (the unconstitutional arrest), then the other is as well. See Wong Sun, 371 U.S. at 484, 83 S.Ct. 407 (“The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.”); see also Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (“[T]he knowledge gained by the Government’s own wrong cannot be used by it simply because it is used derivatively.”) (quotations omitted).
The Government has cited United States v. White, 326 F.3d 1135 (10th Cir.2003), for the statement that “[t]he exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.” Id. at 1140 (quoting Crews, 445 U.S. at 475, 100 S.Ct. 1244 (plurality opinion)). However, neither Crews nor White stand for the proposition that all preexisting Governmental records found as a result of an illegal arrest are exempt from suppression.
In Crews, the Supreme Court expressly noted that “the Fourth Amendment violation ... yielded nothing of evidentiary value that the police did not already have in their grasp.” 445 U.S. at 475, 100 S.Ct. *1120 1244 (plurality opinion). The record in that case indicated that
prior to [the defendant’s] illegal arrest, the police both knew respondent’s identity and had some basis to suspect his involvement in the very crimes with which he was charged. Moreover, before they approached respondent, the police had already obtained access to the “evidence” that implicated him in the robberies, ie., the mnemonic representations of the criminal retained by the victims and related to the police in the form of their agreement upon his description. In short, the Fourth Amendment violation in this case yielded nothing of evidentiary value that the police did not already have in their grasp. Rather, respondent’s unlawful arrest served merely to link together two extant ingredients in his identification.
Id. (footnote omitted) (plurality opinion). It is in this context that the Supreme Court stated that “[t]he exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.” Id. (plurality opinion). In this case, by contrast, while Defendant’s A-file was not developed as the result of any illegal activity, but rather was compiled prior to, and independently of, the illegal seizure of Defendant, the Border Patrol in this case did not effectively have Defendant’s A-file in their grasp. Instead, the practicality of the situations is that they obtained Defendant’s A-file only by first taking his fingerprints.
In White, we held that defendant’s identity and the discovery of his status as a felon from criminal history records were not suppressible. However, we did so based on the doctrine of inevitable discovery, concluding that after the defendant voluntary gave the officers his name, an NCIC check using that name revealed an outstanding warrant that would have inevitably led to the defendant’s arrest and the subsequent discovery of his prior felony conviction regardless of the illegal search. 326 F.3d at 1138. In refusing to suppress the defendant’s status as a felon, we also noted that, at the time the illegal search was conducted, the officers neither knew of nor sought information about the defendant’s status as a felon and consequently the illegal search was not exploited for the purpose of determining White’s identity or his prior felony status. Id. at 1140. Accordingly, in White, we merely reiterated the general rule that evidence gained through exploitation of illegal police conduct must be suppressed unless that evidence would have been inevitably discovered. We did not announce a new rule prohibiting suppression of all previously compiled Government records regardless of whether exploitation of an illegal search and seizure produced the critical link between a defendant’s identity and his immigration or prior criminal history record.
In this appeal, the Government does not argue inevitable discovery. Additionally, for the reasons explained earlier, it is possible that, in contrast to White, the police in this case exploited the illegal detention of Defendant by taking his fingerprints for the very purpose of investigating his immigration or prior criminal history status. Where, as may prove to be the case here, obtaining information regarding a defendant’s immigration status and prior criminal history proves to be the objective of official illegality, the deterrence purpose of the exclusionary rule would effectively be served only by excluding the very evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence. See Elkins, 364 U.S. at 217, 80 S.Ct. 1437 (“[The] purpose [of the exclusionary rule] is ... to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.”); see *1121 also Excluding From Evidence, supra, 69 Yale L.J. at 436 n. 24 (noting that the effectiveness of the exclusionary rule depends on excluding the piece of evidence that is the target of police activity).
The answer to whether Defendant’s A-file “[was] come at by exploitation” of illegal conduct necessarily depends on whether Defendant’s fingerprints were obtained for an investigatory purpose exploiting the unconstitutional arrest or whether they were obtained as part of a routine booking procedure not linked to the purpose of the illegal arrest. Because the officers used Defendant’s fingerprints to obtain his A-file, if those fingerprints are determined to be suppressible as fruits of the poisonous tree, then it follows that the A-file should also be suppressed. Accordingly, whether Defendant’s A-file should be suppressed will need to be decided on remand in conjunction with the evidentiary hearing regarding Defendant’s fingerprints.
CONCLUSION
For the reasons outlined above, we hold that the Supreme Court’s language in Lopez-Mendoza that the “identity” or “body” of a suspect may never be suppressed applies only to jurisdictional challenges over the body of the defendant based upon an illegal arrest or search and does not preclude application of ordinary Fourth Amendment exclusionary rule analysis to determine the admissibility of evidence. We AFFIRM the district court’s opinion insofar as it relates to the suppression of Defendant’s oral statements. However, we REVERSE the court’s decision to suppress the fingerprints taken after Defendant’s arrest and the contents of the A-file. Those matters are REMANDED for further proceedings consistent with this opinion.

. We do not disagree with the dissent’s statement that Agent Armendariz’s recognition of Defendant is not suppressible because Defendant “has no reasonable expectation of privacy in his visual appearance when exposed to the public eye.’’ Dissent at 1124. However, the Government has waived this issue by failing to argue it because Fourth Amendment standing is not jurisdictional. See United States v. Dewitt, 946 F.2d 1497, 1499-1500 (10th Cir.1991) (“[T]he issue of fourth amendment standing could be waived if the government has 'failed to raise it in a timely fashion during the litigation.' ”) (quoting Steagald v. United States, 451 U.S. 204, 209, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (alteration omitted)). Additionally, whether Border Patrol’s recognition of Defendant as a previously deported illegal alien provided probable cause for Defendant’s arrest is irrelevant because, as later discussion explains, the Government conceded on appeal that Defendant's arrest in this case was unlawful.

. At argument, the Government began to argue that Border Patrol had probable cause for the arrest because Agent Armendariz recognized Olivares as an illegal alien. Judge Ebel stopped the Government’s attorney to ask:
"But you’re not appealing that. The district court said there was no probable cause. And .as I understand it you don't appeal that. You appeal only the pure legal question that even without probable cause Lopez-Mendoza does not allow you to suppress. Isn’t that correct?”
The attorney responded, "That’s correct, Your Honor.” Judge Ebel pushed the issue once more and stated, "That is what I asked you at beginning of argument. I wanted to know whether we needed to get into all this probable cause ... I thought you told me no.” Again, the attorney responded, "That’s correct, Your Honor.”

. Our disagreement with the dissent can be expressed very simply and fundamentally: even if the record could factually support a conclusion that probable cause for Defendant's arrest existed, as the dissent claims, the Government has conceded that Defendant’s detention and arrest were unlawful. Contrary to the dissent’s approach, we believe that we must therefore decide this appeal within the framework in which it was presented to us.

. The district court did not expressly conclude that Miranda or the Fifth Amendment had been violated. Rather, Miranda was referenced only to the extent that it indicates an attenuation of the taint. See Brown, 422 U.S. at 603, 95 S.Ct. 2254 (noting that issuance of Miranda warnings are an important, but not dispositive, factor in attenuating the taint between an illegal seizure and a subsequent statement).
In his brief, Defendant argues his statements must be suppressed not only on Fourth Amendment grounds, but also because his Fifth Amendment rights were violated when the officers questioned him without first giving Miranda warnings. Because we ultimately conclude that suppression of Defendant's statements was appropriate under the Fourth Amendment, we do not reach this question.

. For convenience, the above-quoted passage will be referred to in this opinion as the "identity” or "disputed” language from Lopez-Mendoza.

. We note that several courts have similarly found routine booking photographs not to be the fruit of an illegal arrest for the purposes of suppression. See United States v. Beckwith, 22 F.Supp.2d 1270, 1291-1294 (D.Utah 1998) (chronicling cases and distinguishing between photographs taken for investigatory purposes and routine booking photographs); see also Robinson v. State, 53 Md.App. 297, 452 A.2d 1291, 1299 (Md.Ct.Spec.App.1982) ("In the absence of evidence ... tending to show that [defendant]'s ... arrest was not only illegal but was merely a pretext for a general exploratory search (as in Davis ... ) or for gathering evidence in this case (as in United States v. Crews, [445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)]), a routine ‘booking’ photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding."); Commonwealth v. Manning, 44 Mass.App.Ct. 695, 693 N.E.2d 704, 708-09 (1998) (refusing to suppress a defendant’s photograph where "the purpose of the defendant's arrest was not to obtain evidence;" and "the taking of the defendant’s photograph during the booking process was standard police procedure and bore no relation to the purpose or validity of the arrest”) (citation omitted); People v. McInnis, 6 Cal.3d 821, 100 Cal.Rptr. 618, 494 P.2d 690, 693 (1972) (finding that a booking photograph, routinely made pursuant to an arrest, should not be suppressed because there was no evidence of exploitation or other improper government conduct).

. In Davis, the police obtained the defendant’s fingerprints in an attempt to match them to prints found at the scene of a rape. 394 U.S. at 722-23, 89 S.Ct. 1394. Likewise, in Hayes the police detained the defendant specifically to obtain and to compare his fingerprints to fingerprints found at a crime scene. 470 U.S. at 813-17, 105 S.Ct. 1643.

. We note that a leading Fourth Amendment treatise also advocates this reading of Davis. See LaFave, Search and Seizure, § 11.4(g), at 362 ("In Davis the defendant was taken into custody for the purpose of getting his fingerprints for use in investigation of the crime which prompted the illegal arrest, and thus that case should not be read as declaring that fingerprints taken after an illegal arrest are always inadmissible.”).

. The dissent indicates that the benefit of suppressing fingerprint evidence obtained under these circumstances is slight because, as the "Supreme Court [has] observed, ‘only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions.’ " Dissent at 1123-1124 n. 3 (quoting Lopez-Mendoza, 468 U.S. at 1043, 104 S.Ct. 3479.) But the dissent’s cospbenefit analysis fails to recognize that while the benefit of suppression may be slight, the cost of suppression is also slight. Our ruling suppresses evidence only where it can be demonstrated that the officer exploited an illegal arrest to obtain identity-related evidence for *1116 the purpose of pursuing criminal prosecution, not merely deportation proceedings, in which the exclusionary rule does not apply absent an egregious violation of the Fourth Amendment. See Lopez-Mendoza, 468 U.S. at 1050, 104 S.Ct. 3479.

. We agree with the dissent’s conclusion that ”[a]n ultimate resolution in favor of Defendant in this case will [not] exempt him from criminal prosecution,” Dissent at 1124- 1125 n. 4, as this is precisely how we have interpreted Lopez-Mendoza. However, the dissent’s subsequent discussion regarding the continuing nature of an immigration violation and the ability of the Government to require Defendant to submit to additional fingerprinting, as well as our response to it, is dicta, because that issue is not currently before us. Nevertheless, we caution that tire assumption reached by the dissent is not necessarily true because the overriding issue in the fruit of the poisonous tree doctrine is whether evidence "has been come at by exploitation of th[e] [initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (quotations and citation omitted). Accordingly, if the Government by exploitation of Defendant’s (concededly) illegal arrest obtained Defendant's fingerprints and his A-file, the court could decide that even a second set of fingerprint evidence is not sufficiently attenuated to remove the taint and thus should be suppressed as poisonous fruit. See Davis, 394 U.S. at 725 n. 4, 89 S.Ct. 1394 *1117 (refusing to affirm a conviction despite the state's claim that the authorities could have used a second set of prints that were validly obtained, stating that "[t]he important thing is that those administering criminal law understand that they must [obtain evidence in a wholly proper way].”); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.”) (emphasis added).

. The Third Circuit specifically held that, "absent the kind of egregious circumstances referred to in Lopez-Mendoza, ... the Fourth Amendment does not provide a basis for an alien to suppress his/her immigration file, or information in that file." United States v. Bowley, 435 F.3d 426, 431 (3d Cir.2006); see also Lopez-Mendoza, 468 U.S. at 1039, 1050-51, 104-S.Ct. 3479 (qualifying its statement that “[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest,” by noting that it was not in that case considering "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained”); id. at 1051 n. 5, 104 S.Ct. 3479 (citing as examples of possibly egregious circumstances evidence obtained in a "fundamentally unfair [manner] and in violation of due process requirements of the Fifth Amendment;” evidence obtained "after request for counsel had been repeatedly refused;” or evidence obtained "as a result of a night-time warrantless entry into the aliens' residence”) (quotations omitted).

. Both Rawlings and Rakas involved defendants who sought to suppress contraband based on the violation of another person’s Fourth Amendment rights. See Rakas, 439 U.S. at 137, 99 S.Ct. 421 (involving passengers' challenge to the search of a car they did not own); Rawlings, 448 U.S. at 104-06, 100 S.Ct. 2556 (involving a defendant's challenge to the search of someone else's purse). Rakas did not even involve the fruit of the poisonous tree doctrine. 439 U.S. at 160 n. 5, 99 S.Ct. 421. In Rawlings, the defendant made one fruits argument, claiming that his unlawful statements were a fruit of his unlawful detention. However, the Supreme Court refused to suppress the defendant’s statements because it concluded that the taint of the unlawful detention had been attenuated, not because defendant lacked a privacy interest in the statements. See 448 U.S. at 106-10, 100 S.Ct. 2556.