LUCERO, Circuit Judge.
This Fourth Amendment appeal arises from a traffic stop in Albuquerque, New Mexico. In the course of that stop, a police officer questioned Appellant Jose Luis Pena-Montes, the vehicle’s passenger. This led to his arrest and the discovery that Pena-Montes had been previously removed from the United States after a felony conviction. See 8 U.S.C. § 1326(a), (b). Although the officer initiated the stop based on the reasonable belief that the vehicle lacked a license plate, after he pulled it over, he observed that it did, in fact, display a “dealer tag” but continued the detention to question the vehicle’s occupants to determine whether the plate’s use was lawful. Because we conclude that the officer could not have reasonably suspected criminal activity after he saw a dealer plate but before he began questioning the vehicle’s occupants, we hold that the continued detention of Pena-Montes violated the Fourth Amendment’s prohibition against unreasonable searches and seizures.
Notwithstanding the foregoing treatment of the primary issue on appeal, when evidence of an individual’s identity is discovered through routine booking procedures incident to an unlawful arrest, that evidence is not suppressed unless the arrest was purposefully exploited to learn the identity. See United States v. Olivares-Rangel, 458 F.3d 1104, 1115-16 (10th Cir.2006). Having rejected Pena-Montes’ Fourth Amendment argument, the district court had no occasion to determine the purpose of Pena-Montes’ booking. We thus cannot determine whether the evidence of Pena-Montes’ identity must be suppressed on the record before us. Exercising jurisdiction under 28 U.S.C. § 1291, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.
I
A
Before we recount the material facts, it is necessary to resolve confusion engendered by the terminology used in the record. The district court referred to the tag at issue as a “dealer demonstration tag.” In their briefing, the government and Pena-Montes use the term “dealer tag.” However, both of these terms are foreign to New Mexico law. Rather, the New Mexico Statutes regulate “demonstration permits” and “dealer plates,” both of which are issued to licensed dealers. Compare N.M. Stat. § 66-3-6(F) (demonstration permits), with § 66-3-401 (dealer plates).
During trial, the officer effectuating the stop testified that the sole purpose of the type of plate displayed is the demonstration of vehicles, a characteristic consistent with demonstration permits. See N.M. Stat. § 66-3-6(F). However, in the proceedings below, the government volunteered N.M. Stat. § 66-3-401 as the operative statute. In its order denying the motion to suppress, the district court cited that same provision. Similarly, both parties cite § 66-3-401 before this court.
When reviewing the denial of a motion to suppress, we “view[ ] the evidence in the light most favorable to the government and accept[] the factual findings of the district court unless they are clearly erroneous.” United States v. Karam, 496 F.3d 1157, 1161 (10th Cir.2007). Though factual ambiguity exists, it is unnecessary for this court to determine whether con *1051 struing the record to suggest a dealer plate or a demonstration permit would be more favorable to the government. In agreeing on the operative statute, the parties treat as undisputed fact that the Yukon bore a dealer plate; and in basing its ruling on § 66-3-401, the district court implicitly made a factual finding to that effect. Such a finding was not clearly erroneous. We therefore premise our analysis on the fact that the Yukon bore a dealer plate, viewing that factual determination in the light most favorable to the government. With this issue resolved, we proceed.
B
At approximately 9:00 p.m. on the evening of November 9, 2007, Officer Michael Hernandez of the Albuquerque Police Department (“APD”) observed a GMC Yukon traveling eastbound on Central Avenue. Hernandez did not see a license plate on the Yukon, a violation of New Mexico law, prompting him to engage his emergency equipment and pull the vehicle over. As Hernandez approached the vehicle on foot, he observed a dealer plate displayed in the rear window of the vehicle. Undaunted, he continued to approach the driver.
After the driver identified himself as Jeremy Crain, Hernandez asked for his driver’s license, vehicle registration, and proof of insurance. Crain produced his driver’s license and stated that he owned the vehicle, but he could not produce the registration, bill of sale, or proof of insurance, leading Hernandez to suspect the vehicle was stolen. Hernandez knew that within the past year or so, auto dealerships in and around Albuquerque had reported car thefts during which demonstration permits and dealer plates were also taken and used to disguise stolen cars. Upon questioning, Crain told Hernandez that he had a handgun in the car. Hernandez then ordered both occupants to exit the vehicle and wait near the curb while he radioed in the vehicle identification number (“YIN”).
After Hernandez learned that the vehicle had not been reported stolen, a second APD Officer, Daniel Morales, arrived on scene. The officers patted down Crain and his passenger, later revealed to be Pena-Montes. Morales took from the passenger two cell phones, a pair of sunglasses, and $1,800. Because the passenger did not have identification, Hernandez then asked for his name, date of birth, and social security number. The passenger gave his name as Marcus Garcia and claimed to have an Arizona driver’s license, but Hernandez could not find a database record matching the name, social security number, and birth date “Marcus Garcia” provided.
Suspecting the passenger was lying about his identity, Hernandez questioned Crain and the passenger further. The passenger gave a different birth date and social security number than he had previously, and his and Crain’s explanations of how they knew each other were also at odds. Based on these answers, Hernandez handcuffed the passenger and took him into custody for concealing his identity.[1] See N.M. Stat. § 30-22-3. He then transported the passenger first to APD’s identification unit, then to a detention center for booking. After being fingerprinted twice, the passenger was identified through a national database as Jose Luis Pena-Montes.
*1052 A day later, Immigration and Customs Enforcement (“ICE”) interviewed Pena-Montes at the detention center. ICE records showed that he had previously been convicted of a felony in California state court and subsequently deported. Based on this history, Pena-Montes was indicted on one count of reentry of a removed alien after a felony conviction in violation of 8 U.S.C. § 1326(a) and (b).
After being indicted, Pena-Montes moved to suppress all evidence derived from the traffic stop, including his identity. The district court held a hearing on the motion, during which Hernandez and Pena-Montes testified. Concluding that Hernandez reasonably suspected illegal activity when he initiated questioning of Pena-Montes and that probable cause for arrest arose from Pena-Montes’ inconsistent answers, the court denied Pena-Montes’ suppression motion.
Following that denial, Pena-Montes entered a conditional guilty plea, reserving his right to appeal the suppression ruling. This appeal followed.
II
Although we view the evidence in the light most favorable to the government, whether a seizure is reasonable under those facts is a question of Fourth Amendment law we review de novo. Karam, 496 F.3d at 1161. Similarly, when a question of state law is implicated, as here, we “[r]eview[] the district court’s construction of ... state law de novo.” United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir.2004).
A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment. United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1226 (10th Cir.2008). However, because a traffic stop is “necessarily [a] swift action predicated upon the on-the-spot observations of the officer on the beat,” an officer need only reasonably suspect that a crime is in the offing to justify such a detention. Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also Karam, 496 F.3d at 1161. Terry set forth a two-step framework for determining the constitutional scope of a traffic stop: (1) the stop must be “justified at its inception,” and (2) the resulting detention must be “reasonably related in scope to the circumstances that justified the stop in the first place.” United States v. Winder, 557 F.3d 1129, 1133-34 (10th Cir.2009) (quotations omitted). “Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop.” Id. at 1134 (quotation omitted).
Reasonable suspicion arises when “an officer of reasonable caution” has a “particularized and objective basis for suspecting the person stopped of criminal activity” judged against the totality of the circumstances. Id. at 1133-34 (quotations omitted). A mere hunch or conjecture will not suffice. Karam, 496 F.3d at 1162; see also United States v. Caro, 248 F.3d 1240, 1246 (10th Cir.2001). Although the detaining officer’s subjective motivations are irrelevant to our inquiry, we may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion. Winder, 557 F.3d at 1134.
A
We need not linger on the question of whether Hernandez’s stop of the Yukon was “justified at its inception.” Id. Hernandez mistakenly believed that the vehicle did not display a license plate or registration permit in violation of N.M. Stat. § 66-3-18. Pena-Montes concedes that this mistake was objectively reasonable under the circumstances. See United States v. Ledesma, 447 F.3d 1307, 1312 *1053 (10th Cir.2006) (Terry stop justified at inception when defendant concedes officer could not see license plate or temporary registration). Thus, we focus our inquiry on whether the resulting detention was “reasonably related in scope to the circumstances that justified the stop in the first place.” Winder, 557 F.3d at 1134.
B
1
The government acknowledges that the scope of the traffic stop initially extended only to investigating Hernandez’s belief that the vehicle lacked a license plate. “As a general rule, once an officer’s purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go.” United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir.1999). Nonetheless, the government argues that Hernandez was justified in continuing the detention even after he saw a dealer plate on the vehicle to determine whether it was being used lawfully and to investigate whether the Yukon was stolen. A traffic stop “may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of [additional] criminal activity.” United States v. Clarkson, 551 F.3d 1196, 1201 (10th Cir.2009) (quotation and alteration omitted). Accordingly, we consider whether Hernandez reasonably suspected additional criminal activity after he viewed the dealer plate.
As did the district court, we consider the restrictions New Mexico places on the use of dealer plates to be the key to our analysis — but to opposite effect. According to the district court, “Officer Hernandez, upon seeing the dealer demonstration tag, had reasonable suspicion to continue to question the driver about the tag, because, given the time of night, it did not appear that the driver was properly using the tag in violation of [N.M. Stat.] §§ 66-8-2 and 66-3-401. These statutes limit the lawful use of dealer plates to certain circumstances.” [2] At the hearing on the motion to suppress, Officer Hernandez testified that it appeared to be a violation because “[t]he dealer tags are for auto dealerships, and based upon the operations of the auto dealership, their sole purpose is for demonstrating the vehicle or for sales of the vehicle. Usually, it’s for test driving purposes or a demo vehicle.” He went on to explain that dealer plates were therefore usually in use during “what you would call bank hours, eight to five,” when dealerships are typically open. In this respect, both the district court and Officer Hernandez made errors of New Mexico law: the use of dealer plates is not limited to a particular time of day, nor is their use limited to demonstration purposes. Simply put, their use is not limited in any way relevant to the circumstances of this case.
New Mexico law describes a number of types of license plates and registration permits, each of which carries a particular set of restrictions. A standard license plate, § 66-3-14, must be displayed on “the vehicle for which it is issued,” § 66-3-18, and may no longer be displayed on a vehicle after it is sold except in special circumstances, § 66-3-104. Even in those circumstances, the vehicle may be operated with the plate only after it has been registered to the new owner and a new registration certificate issued. Id.
“Dealer plates,” the type of license plates at issue in this ease, are governed by § 66-3-401 to § 66-3-404. They may *1054 be issued for “[a]ny vehicle ... included in the inventory of a dealer,” and such a vehicle “may be operated or moved upon the highways for any purpose.” § 66-3-401(A) (emphasis added). Unlike with other plates, a vehicle with a dealer plate need not be titled. § 66 — 3—401(C). As an alternative to using a dealer plate, a dealer may title and register a vehicle in its inventory, in which case it will be issued a standard plate. § 66-3-401(D). Based on the volume of business it does, a dealer is limited in how many plates it may be issued, § 66-3-402, and all dealer plates expire at the end of each calendar year, § 66-3^03. The primary restrictions on dealer plates are: they may not be used on parts or delivery vehicles, towing vehicles, courtesy shuttles, or vehicles loaned to customers for their convenience, § 66-3-402(B); they are not transferable between vehicles without re-registration, § 66-3-401(A); and they may never be transferred between dealers, § 66-3-404. A vehicle with a dealer plate “may be operated or moved upon the highways for any purpose.” The statute implies near-equivalence between a dealer plate and a standard license plate. See § 66-3-401(D) (“In lieu of the use of dealer plates pursuant to this section, a dealer may register and title a vehicle included in a dealer’s inventory....”). We conclude that the primary purpose of a dealer plate is to allow a dealership to use a small number of untitled vehicles as general purpose vehicles.
Errors made by an officer conducting a traffic stop generally fall into one of two categories: mistakes of fact and mistakes of law. “An officer’s reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop.” DeGasso, 369 F.3d at 1144 (citation omitted). An officer’s “failure to understand the plain and unambiguous law he is charged with enforcing, however, is not objectively reasonable.” Id. (citation omitted). The record is clear that Hernandez extended the traffic stop based on a mistake of law, not a mistake of fact. Once he observed the dealer plate on the vehicle, his mistake of fact — that the vehicle had no plate at all — was corrected, but he continued his investigation because he mistakenly believed that the lawful use of dealer plates was limited to demonstrating vehicles.[3] As explained above, New Mexico places no such limitation on the use of dealer plates; indeed, a dealer plate permits the general use of a vehicle. This mistake of law was immediately compounded, as Hernandez found the use of a dealer plate suspicious because vehicle demonstrations typically take place during business hours. It was this combination of circumstances that led Hernandez to suspect that the Yukon was stolen and thus question Crain and Pena-Montes.
Absent this error of law, it becomes clear that reasonable suspicion was dispelled as soon as Hernandez discovered his mistake of fact — that is, when he saw that the Yukon did, in fact, have a license plate permitting general purpose use. The scenario is on all fours with United States v. McSwain, 29 F.3d 558 (10th Cir.1994). There, a state trooper pulled over McSwain because he believed the vehicle’s temporary registration sticker was unlawfully displayed when in fact it was a type of sticker with which the officer was unfamiliar. Id. at 560. McSwain conceded that this mistaken belief justified the initial stop. As here, however, the trooper discovered his mistake as he approached the car, before he questioned the driver. This *1055 discovery wholly dispelled his reasonable suspicion:
Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. Trooper Avery’s further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop’s underlying justification.
Id. at 561. Like the trooper in McSwain, Hernandez’s investigation was complete when he saw that the vehicle actually had a plate — before he began questioning the vehicle’s occupants.[4]
2
Nonetheless, the government argues that Hernandez was justified in continuing the detention, even after he saw the dealer plate on the vehicle, to determine whether it was being used lawfully and to investigate whether the Yukon was stolen. A traffic stop “may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.” Clarkson, 551 F.3d at 1201 (quotation and alteration omitted). Accordingly, we con-sider whether Hernandez reasonably suspected additional criminal activity after he viewed the dealer plate.
The government offers three factors in support of its contention that Hernandez possessed reasonable suspicion that the vehicle was stolen or was improperly using tie plate. First, Hernandez testified that “a lot of narcotics dealing as well as prostitution” occurred in the area of the stop. Second, Hernandez knew that dealerships in the Albuquerque area had experienced car thefts in the preceding “year or so” in which the thieves also stole dealer plates. Lastly, Hernandez testified that, in his experience, dealer plates are typically used during business hours. This contention is based on the following testimony:
Q. ... [W]ith regard to these dealer tags, do you have an understanding as to what the purpose of that tag is? And if so, can you describe it for me?
A. The dealer tags are for auto dealerships, and based upon the operations of the auto dealership, their sole purpose is for demonstrating the vehicle or for sales of the vehicle. Usually, it’s for test driving purposes or a demo vehicle.
Q. In your experience, do you typically — would you typically see that type of tag in use during the daytime?
A. During the daytime, yes, as in from what you would call bank hours, eight to five. Usually not seen driven around for just[,] I guess[,] owner purposes.
The three factors identified by the government do not provide the particularized reasonable suspicion necessary to justify detention once Hernandez observed the plate. The first two factors provide little heft in the reasonable suspicion analysis. That the stop occurred in a high-crime area is a relevant consideration but does not permit police to detain an individual without additional, particularized observations. See United States v. Dennison, 410 F.3d 1203, 1207-08 (10th Cir.2005). Further, we hesitate to give this *1056 factor much weight when the area was not known for car theft, but for narcotics and prostitution. Cf. United States v. Samuels, 493 F.3d 1187, 1192-93 (10th Cir.2007) (suspicion of drug dealing reasonable when “drug transactions occurred often in the convenience store itself and the area surrounding it”); United States v. Rice, 483 F.3d 1079, 1081 (10th Cir.2007) (suspicion of burglary reasonable when the officer had “had previously responded to shootings, murders, and burglaries nearby”); Dennison, 410 F.3d at 1205 (suspicion of car theft reasonable at an “apartment complex that had a high incidence of nighttime car theft”). Similarly, the fact that stolen dealer plates had been used to disguise stolen vehicles in the Albuquerque area within “a year or so” of the stop is of limited relevance. It provides general background, but given the size of Albuquerque and the time span involved, it is unquestionably not particularized to the actual plate Hernandez observed.
Although ultimately insufficient, the time of day, the final factor cited by the government, provides greater support for its position. Crediting Hernandez’s testimony that it was unusual to see a dealer plate outside of “bank hours,” the district court held:
Officer Hernandez, upon seeing the dealer demonstration tag, had reasonable suspicion to continue to question the driver about the tag, because, given the time of night, it did not appear that the driver was properly using the tag in violation of [N.M. Stat.] §§ 66-8-2[5] and 66-3^101. These statutes limit the lawful use of dealer plates to certain circumstances.
In defense of this proposition, the government argues that “dealerships do not have carte blanche to use the tags in any way they see fit.” However, it is patently insufficient that the law contains restrictions. There must exist a “particularized and objective basis for suspecting the particular person stopped” is violating one or more such restrictions. Clarkson, 551 F.3d at 1201. Yet the government wholly fails to connect the prohibitions contained in § 66-3^101 to the encounter under consideration in any meaningful way. It may have been unusual to see dealer plates at 9:00 p.m., but none of the restrictions in § 66-3-401 is more likely to be violated at this hour than at any other.
The New Mexico Court of Appeals has expressly established that the Motor Vehicle Code contains no time-of-day restrictions. In State v. Aguilar, 141 N.M. 364, 155 P.3d 769 (N.M.Ct.App.2007), the New Mexico Court of Appeals faced a very similar set of circumstances: At 2 a.m., a state police officer pulled over a vehicle because it did not appear to have a license plate. Id. at 770-71. After pulling the car over, he was able to see a temporary demonstration permit in the rear window, but because he knew that “a lot of temporary dealer tags are stolen and misused” and he “thought the possibility that -a person would be demonstrating a vehicle at 2 a.m. was unreasonable,” he continued the detention and questioned the driver. Id. at 771. The New Mexico Court of Appeals explained:
[T]he statute does not provide any time-of-day limitation for the activities permitted with the use of a temporary demonstration plate. Accordingly, it is legal to allow an overnight test drive of a vehicle, or even a few days’ test driving. There is nothing unreasonable about such a practice. Thus, the facts relied *1057 upon by the officer were evidence of neutral conduct — conduct that is permissible under [the statute].
Id. at 773.[6] The government argues that Aguilar interpreted a different statute than the one at issue here, but the distinction is of no moment. In Aguilar, § 66-3-6(F), the provision governing demonstration permits, was at issue. The permissible uses of demonstration permits are also permissible uses of dealer plates, as a vehicle displaying the latter may be used “for any purpose.” § 66-3-6(F).
The government cites Gross v. Pirtle, 116 Fed.Appx. 189 (10th Cir.2004) (unpublished), for the proposition that it is “reasonable for [an officer] to want to ensure use of a dealer plate was lawful.” Id. at 198. Gross, however, did not announce a blanket rule permitting police to detain every car bearing dealer plates; it simply concluded reasonable suspicion arose on the facts presented. In that case, an officer “observed that [the detained vehicle] was littered with receipts leading him to become suspicious regarding the use of the vehicle, in particular, whether the vehicle was being used as a parts vehicle.” Id. at 199. Relying on the prohibition in § 66-3-401(B) against the use of dealer plates on a parts vehicle, this court concluded the officer’s actions were supported by reasonable suspicion. Id. at 199 & n. 20.
In Gross, the government established reasonable suspicion by citing a particularized observation that led an officer to suspect that the defendant was violating an actual restriction on the use of dealer plates.[7] In sharp contrast, the government here provides no particularized facts and does not even identify the provision Hernandez could have suspected was being violated. It asserts that Hernandez “could not discern whether the dealer tag was issued to this vehicle as required by New Mexico statute, or whether the vehicle was authorized to display the dealer tag.” That may well be true, but the government bears the burden of demonstrating reasonableness. See United States v. Guerrero-Espinoza, 462 F.3d 1302, 1305 (10th Cir.2006). All the government has established is that it is possible to violate § 66-3-401. Absent some particularized, objective basis to believe the dealer plate was actually not issued to this vehicle or that it was actually not authorized to display the plate, further detention was unconstitutional. See Clarkson, 551 F.3d at 1201.
Viewing the government’s asserted factors in concert, we conclude that Officer Hernandez lacked a “particularized and objective basis for suspecting legal wrongdoing.” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quotation omitted). To conclude *1058 otherwise would grant permission to the APD to detain and question every ear with a dealer plate driving along Central Avenue after most dealerships are closed. Cf. Aguilar, 155 P.3d at 773. We decline to sign this blank check. As in McSwain, the law enforcement officer should not have questioned the driver of the vehicle after his sole cause for suspicion was dispelled. Here, that suspicion was dispelled when Hernandez observed the dealer plate in the Yukon’s window. At that point, an officer’s permissible conduct is limited: “As a matter of courtesy, the officer could explain to drivers in [these] circumstances the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver’s license and registration.” McSwain, 29 F.3d at 562. Because Hernandez failed to follow this guidance and chose to further pursue his investigation without a basis in reasonable suspicion, his actions violated the Fourth Amendment.
Ill
Our inquiry does not end with the determination that Hernandez unconstitutionally detained and questioned Pena-Montes. The critical evidence necessary to convict Pena-Montes is identity itself: his fingerprints and related records. According to the government, this evidence was obtained “as part of a routine booking or processing procedure” and thus not subject to the exclusionary rule. See United States v. Olivares-Rangel, 458 F.3d 1104, 1116 (10th Cir.2006). However, we recognized an exception to the general “routine booking procedure” rule:
[I]f an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed.... Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree.
Id. at 1115-16 (citations and footnote omitted). This determination, Olivares-Ran-gel establishes, depends on “[t]he precise circumstances under which Defendant was arrested and his fingerprints taken.” Id. at 1116.
Because the district court found that probable cause supported the continued detention of Pena-Montes, it did not consider the relevance of Olivares-Rangel. The record on appeal contains little evidence as to the purpose of Pena-Montes’ fingerprinting. Accordingly, we remand for further fact-finding on this issue.
IV
For the foregoing reasons, we VACATE the judgment of the district court and the order denying the motion to suppress and REMAND for further proceedings consistent with this opinion.

. The parties also contest whether, based on these circumstances, Hernandez had probable cause under New Mexico’s law regarding identity concealment, but we conclude that it is unnecessary to reach that issue. We caution the reader not to interpret this mere recitation of the facts to bear on this legal question.

. Section 66-8-2 prohibits any improper use of "any certificate of title, registration evidence, registration plate, special plate, validating sticker or permit,” and § 66-3-401 governs the operation of vehicles under dealer plates.

. We express no opinion on whether a more limited-use tag would have rendered Hernandez’s suspicion of criminal activity reasonable.

. The government contends that McSwain is distinguishable because, in that case, the trooper only suspected a traffic violation, not that the car was stolen. But the subject of Hernandez's actual suspicion is of no moment; the question is whether the information known to the officer supported some objectively reasonable suspicion of criminal activity.

. Section 66-8-2 prohibits the improper use of license plates and registration permits generally.

. As we do here, the Aguilar court reviewed the denial of a motion to suppress, and it reversed and remanded with instructions to vacate the judgement and sentence entered below. Aguilar, 155 P.3d at 775. However, we do not defer to a state court’s determination of constitutional reasonableness, and we cite Aguilar here only for its holding regarding the interpretation of New Mexico motor vehicle law. See TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1181 (10th Cir.2007) ("A federal court must follow the state’s highest court in pronouncing or construing the state’s common law, statutory law, or constitutional law. But it owes no deference to state-court interpretation of the United States Constitution.”).

. We do not suggest that an officer must "be able to quote statutes (or scripture), chapter and verse.” United States v. Eckhart, 569 F.3d 1263, 1272 (10th Cir.2009). In Eckhart, we determined that reasonable suspicion existed when an officer actually observed a violation but was incorrect about which provision of the law his observation violated. Id. As the government does not point to some actual violation, the Eckhart rule does not apply here.