FILED
United States Court of Appeals
Tenth Circuit

July 16, 2015

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

JOSHUA JAKE ARCHULETA,

Defendant - Appellee.

No. 13-4151
(D.C. No. 2:13-CR-00132-CW-1)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BALDOCK**, and **HOLMES**, Circuit Judges.

Joshua Jake Archuleta was charged with being a drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). Mr. Archuleta was arrested after he admitted that the rifle he was carrying belonged to him and that he was addicted to methamphetamine. The government appeals from an order of the district court suppressing Mr. Archuleta's statements and the physical evidence obtained during his encounter with the police. Exercising jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we **affirm**.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

**I**

At approximately 1:25 a.m. on January 10, 2013, Mr. Archuleta was riding a bicycle along the sidewalk in West Valley City, Utah. He was wearing a red backpack and carrying a nondescript black bag over one shoulder. Mr. Archuleta crossed the street and rode into a large, well-lit parking lot of a twenty-four-hour convenience store. As he did so, a police officer with the West Valley City Police Department pulled his patrol car in behind Mr. Archuleta and activated his overhead lights. In response, Mr. Archuleta stopped his bicycle in the parking lot.

The officer stated that he was on routine patrol when he observed Mr. Archuleta riding a bicycle at night with no lights. He described the location of the stop as a "high-crime area." Aplt. App. at 88 (Tr. Mot. to Suppress, dated May 16, 2013). As the officer testified:

> [THE GOVERNMENT:] Have you previously made arrests in that area before?
>
> [THE OFFICER:] I have.
>
> [THE GOVERNMENT:] Would you describe it as a high-crime area?
>
> [THE OFFICER:] Yes.
>
> [THE GOVERNMENT:] Why is that?
>
> [THE OFFICER:] The [convenience store] there on the corner usually has beer thefts, we have—we adjoin with a city connected, which is Kearns, usually is a crime area, a high-crime

2

area as well.

*Id*. The officer had witnessed Mr. Archuleta ride his bicycle across the street and turn into the parking lot, an act which he believed constituted jaywalking. After stopping Mr. Archuleta, the officer got out of his patrol vehicle.

Mr. Archuleta asked why he had been stopped. The officer replied that it was because he did not have any lights on his bicycle and was jaywalking. At that point, the officer inquired as to the contents of the black bag. Mr. Archuleta indicated that the bag contained a firearm. After instructing Mr. Archuleta to raise his hands above his head, the officer removed the black bag from Mr. Archuleta's person and placed it on the hood of his patrol car. The officer asked Mr. Archuleta if the firearm belonged to him. Mr. Archuleta said that it did, indicating that he had just purchased it from an individual in Kearns. It appears to be undisputed that, standing alone, Mr. Archuleta's possession of the firearm in the black bag did not violate Utah law.[1] Mr. Archuleta did not display any signs

---

[1]     At the time of the encounter, Utah law defined a "concealed dangerous weapon" as "a dangerous weapon that is: (i) covered, hidden, or secreted in a manner that the public would not be aware of its presence; and (ii) readily accessible for immediate use." Utah Code Ann. § 76-10-501(3)(a) (2014). "A dangerous weapon is not a concealed dangerous weapon if it is a firearm which is unloaded and is securely encased." *Id.* § 76-10-501(3)(b). The statute defined "securely encased" to mean "not readily accessible for immediate use, such as held in a gun rack, or in a closed case or container, whether or not locked . . . ." *Id.* § 76-10-501(18). At an evidentiary hearing, the officer testified that the black bag was zipped up and the firearm was disassembled. The officer believed the firearm was not loaded and agreed that it did not constitute a "concealed dangerous weapon" under Utah state law. The government does not

(continued...)

3

of intoxication and did not appear nervous or evasive.  The officer described Mr. Archuleta as calm and very cooperative.

Asked for identification, Mr. Archuleta provided his name and date of birth.  The officer returned to his patrol car to verify Mr. Archuleta's identity and to search for any outstanding warrants and criminal history in the police database.  The officer found Mr. Archuleta's driver's record in the database and determined that he had no outstanding warrants.  A search of his criminal history revealed that Mr. Archuleta had one class A misdemeanor drug conviction in addition to other drug charges that had not resulted in convictions and a charge for domestic violence.

At that point, the officer returned from his patrol car and asked Mr. Archuleta "if he knew about his criminal history." *Id*. at 99.  Specifically, the officer asked if Mr. Archuleta was aware of his "drug history." *Id.*  Mr. Archuleta said yes and indicated that he was a drug user.  The officer asked if he had used drugs that day.  Mr. Archuleta responded that he had used drugs earlier on the same day.  The officer asked if he had any drugs on him, and Mr. Archuleta indicated that he was in possession of methamphetamine.  The officer then placed Mr. Archuleta in handcuffs and commenced a search of his person, his backpack, and the black bag containing the firearm.

---

[1](...continued)
advance a contrary position on appeal.

The officer first searched Mr. Archuleta's person and found no drugs. He asked where the drugs were located, and Mr. Archuleta stated that they might be in his backpack. Mr. Archuleta told the officer that there was a drug scale in the backpack as well. The officer searched the backpack and located the scale, but found no drugs. Mr. Archuleta explained that he might have left the drugs at the Kearns address where he came from. Finally, the officer searched the black bag. In addition to discovering a disassembled rifle and several rifle barrels, the officer found syringes. Mr. Archuleta denied that the syringes belonged to him and indicated that they possibly belonged to the previous owner of the firearm.

Following these searches, the officer took Mr. Archuleta back to his patrol car and read him the *Miranda* warnings[2] from a card. Mr. Archuleta agreed to speak further with the officer, and the officer continued to ask about his drug use. Mr. Archuleta indicated that he used drugs once or twice a day; he further explained that he was currently separated from his wife and did not have custody of his children because of his drug use. Mr. Archuleta indicated that he had no stable employment and was working only odd jobs. He stated that he used methamphetamine by smoking it.

---

[2]     *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966) (holding that, when "taken into custody," a person "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

The officer asked about the rifle, and Mr. Archuleta explained that someone had traded it to him in lieu of payment for a non-drug-related debt. He stated that he was transporting the firearm to his mother's house and was unaware that he could not carry it. The officer advised Mr. Archuleta that he was going to be charged with possession of a firearm by a restricted person, possession of drug paraphernalia, and jaywalking. The officer then proceeded to transport Mr. Archuleta to the Salt Lake County Jail. According to the officer, the entire encounter took approximately twenty-five minutes.

Mr. Archuleta was charged in the United States District Court for the District of Utah with one count of being a drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). He moved to suppress the evidence obtained during his encounter with the police. The district court conducted an evidentiary hearing at which the officer was the only witness. Following full briefing and oral argument by the parties, the court granted Mr. Archuleta's motion to suppress and excluded from evidence his statements and the items seized from his possession. The government now appeals from that ruling.

## II

"When reviewing the grant of a motion to suppress, this court examines the evidence in the light most favorable to the defendant and accepts the district court's factual findings unless they are clearly erroneous." *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). "The ultimate determination as to

6

whether an officer's conduct violates the Fourth Amendment, however, is reviewed de novo." *Id.* "The [g]overnment bears the burden of proving that a seizure is reasonable." *United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013).

## A

Mr. Archuleta concedes that the initial stop for improper bicycle lighting and jaywalking was justified at its inception. The issue, then, is whether there was sufficient reasonable suspicion to justify Mr. Archuleta's continued detention in order to question him about his criminal history. The government contends that "the stop was properly extended based on reasonable, articulable suspicion that Archuleta might be a drug user in possession of a firearm arising from Archuleta's admitted ownership of the gun he was carrying and his drug-related criminal history." Aplt. Opening Br. at 7. We disagree.

We conclude that the officer violated the Fourth Amendment by continuing to detain Mr. Archuleta in the absence of a particularized and objective basis to suspect that he might be engaged in criminal activity.[3] Accordingly, we affirm

---

[3] We note that the district court rested its suppression ruling in part on the Fifth Amendment. Considering the totality of the circumstances, it concluded that Mr. Archuleta was in custody "at *least* from the moment that [the officer] returned from running the background check and, instead of issuing a citation and returning the gun, began to question Archuleta about his drug use." Aplt. App. at 211 (Mem. Decision & Order, filed Oct. 3, 2013). Further, reasoning that the officer knew or should have known that his questions and actions were reasonably likely to elicit incriminating statements, the court found that his questioning

(continued...)

7

the district court's suppression of the evidence obtained during Mr. Archuleta's encounter with the police.

**B**

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Trestyn*, 646 F.3d 732, 741 (10th Cir. 2011) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *accord United States v. Oliver*, 363 F.3d 1061, 1065 (10th Cir. 2004). For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention rather than a custodial arrest. *See United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011); *accord United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997). Consequently, we analyze the reasonableness of a traffic stop under the principles pertaining to investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). *See Trestyn*, 646 F.3d at 742; *Oliver*, 363 F.3d at 1066.

----

[3](...continued)
constituted an interrogation and that the officer should have therefore given Mr. Archuleta *Miranda* warnings.

However, the government concedes that the Fourth Amendment is determinative of the issues presented on appeal. *See* Aplt. Reply Br. at 6 ("[T]he Fourth Amendment is dispositive. If there was no reasonable suspicion to extend the *Terry* stop during the brief questioning after the background check, the analysis would end. All resulting evidence would have to be suppressed as fruit of that illegal detention."). And because we conclude that the evidence must be suppressed under the Fourth Amendment, we need not consider the district court's analysis under the Fifth Amendment.

As relevant here, where the propriety of the initial stop is not at issue, we must solely determine whether the officer's actions during the detention were reasonably related in scope to the circumstances that justified the interference in the first place. *See Terry*, 392 U.S. at 20. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *accord United States v. Winters*, 782 F.3d 289, 296 (6th Cir.), *petition for cert. filed*, No. 15-5008 (June 27, 2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, --- U.S. ----, 135 S. Ct. 1609, 1614 (2015) (citations omitted); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614.

An officer may extend a traffic stop beyond its initial scope, however, in either of two circumstances: (1) if, during the stop, the officer acquires "a particularized and objective basis for suspecting the person stopped of criminal activity"; or (2) if the driver voluntarily consents to further questioning. *United*

9

*States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *accord Trestyn*, 646 F.3d at

742. As we have previously explained:

> In the first situation [i.e., where there is a particularized,
> objective basis for suspecting criminal activity] a Fourth
> Amendment seizure has taken place, but it is reasonable and
> consequently constitutional. In the second [i.e., where there is
> consent] there is no seizure, and hence the Fourth Amendment's
> strictures are not implicated. But if neither of those factors is
> present, evidence derived from further questioning (or, a fortiori,
> from an ensuing search) is impermissibly tainted in Fourth
> Amendment terms.

*United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994). Because there is no

indication of voluntary consent,[4] the legality of the continued detention in this

case turns on whether the officer had a particularized, objective basis to suspect

that Mr. Archuleta was engaged in criminal activity.

No single factor is dispositive with respect to the existence of reasonable

suspicion. Instead, we look at the "totality of the circumstances of each case to

see whether the detaining officer has a particularized and objective basis for

_____

[4]     "Whether an encounter is a detention or a consensual encounter
depends on whether the police conduct would have conveyed to a reasonable
person that he or she was not free to decline the officer's requests or otherwise
terminate the encounter." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th
Cir. 1996) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v.
Little*, 60 F.3d 708, 711 (10th Cir. 1995)). "A person is seized only when that
person has an objective reason to believe he or she is not free to end the
conversation with the officer and proceed on his or her way." *Id.* (citing *United
States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990)). The district court ruled
that the encounter was not consensual, and we find no reason to disturb that
conclusion. The government appears to tacitly concede as much, in that it does
not argue consent and proceeds solely on the argument that there was reasonable
suspicion to support the extended seizure.

suspecting legal wrongdoing." *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In doing so, we must "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* (alteration omitted) (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995)). Nevertheless, reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch." *De La Cruz*, 703 F.3d at 1196 (quoting *Chavez*, 660 F.3d at 1221).

The government identifies four factors that it contends establish reasonable suspicion that Mr. Archuleta was a drug user in possession of a firearm: (1) Mr. Archuleta's possession of the firearm; (2) the time of day (approximately 1:25 a.m.); (3) the "high-crime area"; and (4) Mr. Archuleta's criminal history. Considering the totality of the circumstances, we are not persuaded that any of these factors, either individually or in the aggregate, provided a proper foundation for reasonable suspicion.

First, the government points to Mr. Archuleta's possession of the firearm and argues that "[i]f there was reasonable suspicion that Archuleta was a drug user, his admitted possession of a gun was highly suspicious." Aplt. Reply Br. at 12. The problem with this argument is that the officer obtained the reasonable suspicion that Mr. Archuleta was a drug user only by illegally continuing his detention to question him about his criminal history. Put another way, the

11

argument is circular: the officer had no objective reason to believe that Mr. Archuleta's possession of the gun was unlawful due to his drug use until *after* the officer improperly extended the stop to ask Mr. Archuleta about his criminal history; it was then that the officer gained information about Mr. Archuleta's drug use. Mr. Archuleta candidly admitted to his possession of the firearm and there is no contention here that, absent more, such possession was unlawful. And there were no indicators—either in Mr. Archuleta's appearance or demeanor—that would have led a reasonable officer to believe that he was under the influence of drugs. In short, at the time that the officer continued his detention of Mr. Archuleta, he lacked any particularized, objective reason to believe that Mr. Archuleta's possession of the firearm was unlawful.

Second, the government argues that the time of day—approximately 1:25 a.m.—lends weight to the reasonableness of the officer's suspicion. It is true that we have previously recognized that the time of day can contribute to the totality of the circumstances giving rise to reasonable suspicion. *See, e.g.*, *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) ("[T]he late hour at which the police stopped Mr. Guardado lends weight to the reasonableness of the officers' suspicion."); *Clarkson*, 551 F.3d at 1202 ("This court has also considered the time of night as a factor in determining the existence of reasonable suspicion."). On these facts, however, the time of day appears entirely unremarkable. Mr. Archuleta was stopped while turning into the parking lot of a twenty-four-hour

12

convenience store that was open for business.  This fact, without more, should not have aroused law enforcement's reasonable suspicion that Mr. Archuleta was involved in criminal wrongdoing.  And there were no other facts in the totality of circumstances that would have given the time of day probative value in the reasonable-suspicion calculus.  Therefore, the government's argument predicated on the time of day is unavailing.

Third, the government relies on the officer's testimony that the stop occurred in a "high-crime area."  "That the stop occurred in a high-crime area is a relevant consideration but does not permit police to detain an individual without additional, particularized observations."  *United States v. Pena-Montes*, 589 F.3d 1048, 1055 (10th Cir. 2009); *see also United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) ("[Defendant]'s presence in a high-crime area is not, 'standing alone,' enough to provide reasonable suspicion, but it may be a 'relevant contextual consideration' in a *Terry* analysis." (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))).  The totality of the evidence that the government marshaled to support the high-crime-area characterization was merely the testimony of the arresting officer that he was aware that beer thefts had occurred at the nearby convenience store and that the adjoining city of Kearns was a high-crime area.

This high-crime-area evidence is meager.  Indeed, in part, the officer's testimony did not even relate to the area where Mr. Archuleta was seized but,

13

instead, to a neighboring town. And, besides the apparent beer thefts, his statements were devoid of specifics regarding the kinds of crimes that plagued the area and their frequency. In this regard, the evidence was only of limited probative value in the assessment of whether there was reasonable suspicion to believe that Mr. Archuleta was a drug user in possession of a firearm. *Compare Pena-Montes*, 589 F.3d at 1055–56 (giving little weight to the high-crime-area evidence where the crime at issue was car theft "when the area was not known for car theft, but for narcotics and prostitution"), *with United States v. Samuels*, 493 F.3d 1187, 1192–93 (10th Cir. 2007) (holding that suspicion of drug dealing was reasonable when "drug transactions occurred often in the convenience store itself and the area surrounding it"), *and United States v. Rice*, 483 F.3d 1079, 1081, 1085 (10th Cir. 2007) (concluding that suspicion of burglary or drive-by shooting was reasonable when the officer "had previously responded to shootings, murders, and burglaries nearby"). In other words, the officer's high-crime-area observations did not shed any particularized light on the question of whether the area where Mr. Archuleta was seized was even appreciably more likely than others to be visited by drug users possessing firearms. In sum, on these facts, we find that the high-crime-area evidence adds little to the reasonable-suspicion calculus, and it therefore does not meaningfully advance the government's cause here.

Fourth, the government relies on Mr. Archuleta's criminal history. Under

14

our precedents, this is the most significant factor weighing in the government's favor. *See, e.g.*, *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus."). Nevertheless, "[a]n individual's criminal record, by itself, is not a sufficient basis for reasonable suspicion." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011); *see Santos*, 403 F.3d at 1132 ("Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches."); *Sandoval*, 29 F.3d at 542 ("[E]ven knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion."). Our decision to eschew according determinative weight in the totality-of-the-circumstances analysis to criminal history is significant, because "[i]f the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all." *Sandoval*, 29 F.3d at 543.

Mr. Archuleta's criminal history contributes little to the reasonable-suspicion inquiry. The officer was aware that Mr. Archuleta had a single misdemeanor drug conviction and knew that he had other drug charges, but not convictions. There was no specificity with respect to the nature of these drug charges and no indication of how old they might be. And the government has

15

failed to identify any meaningful connection between the evidence and the officer's suspicion that Mr. Archuleta was a current, active drug user. While an individual's criminal history is indeed a relevant consideration, Mr. Archuleta's history is insufficient to support a finding of reasonable suspicion.

Though we have concluded that the four factors identified by the government—when analyzed separately—are inadequate to demonstrate a proper foundation here for reasonable suspicion, we must of course view these four factors in the aggregate and in the context of the totality of the circumstances in determining whether there were enough objective indicators to support a finding of reasonable suspicion. *See, e.g.*, *Santos*, 403 F.3d at 1133 ("[A]s the Supreme Court has admonished, it would be legal error to employ a divide-and-conquer strategy." (citing *Arvizu*, 534 U.S. at 274)). Having conducted a totality-of-the-circumstances analysis, we conclude that the government has failed to meet its burden of establishing reasonable suspicion. The strongest piece of evidence in the government's favor (i.e., supporting reasonable suspicion) is Mr. Archuleta's criminal history. But, neither standing alone, nor in combination with all of the other circumstances, is Mr. Archuleta's criminal history sufficient to provide the basis for reasonable suspicion here.

All of the cases that the government cites in asserting a contrary position actually involved a host of suspicious factors that supported the ultimate conclusion that reasonable suspicion was present. In *Santos*, for example, we

16

considered the defendant's criminal history to be the most significant factor in the analysis. *See* 403 F.3d at 1132. But, we emphasized several other indicators of possible wrongdoing as well, including that the defendant lied about his criminal history, was nervous, attempted to deflect the officer's questions, told inconsistent stories, had a suspicious rental car agreement, and carried a locked bag with a storage locker tag on it. *See id.* at 1133–34. Considering those factors as a whole, we determined that the officer's suspicion was reasonable. *See id.* at 1134.

In this case, however, beyond Mr. Archuleta's criminal history, the government can point only to "[t]he time of night and location of the stop, indicating that some type of criminal activity was afoot." Aplt. Reply Br. at 17–18. As we have previously counseled, some facts must be "outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005) (quoting *Wood*, 106 F.3d at 946). We find nothing suggestive of criminality in Mr. Archuleta's presence in a well-lit parking lot of a twenty-four-hour convenience store. In short, relying on Mr. Archuleta's comparatively minor and temporally nebulous criminal history as a basis for suspecting him of currently being a drug user in possession of a firearm involves just the sort of "inchoate and unparticularized suspicion or 'hunch'" that the Supreme Court has told us is legally inadequate to support reasonable suspicion. *United States v. Sokolow*, 490

17

U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *accord United States v. Simpson*, 609 F.3d 1140, 1147, 1153 (10th Cir. 2010).

Accordingly, in the absence of any reasonable suspicion of criminal activity, the officer's continued detention of Mr. Archuleta was an unlawful seizure under the Fourth Amendment. The government seeks to minimize the intrusion by emphasizing that the officer extended the stop only "a minute or two," Aplt. Reply Br. at 8, in order to ask a few additional questions. This argument is misguided. The officer either had reasonable suspicion to continue to detain Mr. Archuleta or he did not. Put another way, even if brief, an illegal seizure is an illegal seizure. *See Rodriguez*, 135 S. Ct. at 1614 (stating that the "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"); *Royer*, 460 U.S. at 500 (noting that a *Terry* stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); *see also Lopez*, 443 F.3d at 1285–86 (holding that the five-minute continued detention of the suspect by failing to return his driver's license, after the justification for the initial detention was dispelled, was unconstitutional). The continued detention of Mr. Archuleta was an illegal seizure. As a consequence, the district court properly suppressed all of the evidence stemming from this seizure (i.e., Mr. Archuleta's statements and the physical evidence) as the fruit of the illegality. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).

18

## III

For the foregoing reasons, we **AFFIRM** the district court's order granting the motion to suppress.

Entered for the Court

JEROME A. HOLMES

Circuit Judge